Janice L. STURMAN, Appellant (Defendant),

v.

FIRST NATIONAL BANK, Torrington, Wyoming, Appellee (Plaintiff).

No. 86-117.

Supreme Court of Wyoming.

Dec. 11, 1986.

Maren K. Felde and Roger C. Elletson of Elletson, Doby and Felde, Cheyenne, for appellant.

Michael E. Warren of Sawyer, Warren & Kautz, Torrington, for appellee.

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

MACY, Justice.

First National Bank of Torrington, appellee, filed an action to recover certain secured property pursuant to the terms of six promissory notes, two security agreements, and a financing statement signed by Janice Sturman, appellant. Following several hearings on the matter, the district court granted summary judgment for the bank. From that judgment, appellant now appeals to this Court.

We affirm.

Since 1971, the bank has financed the operations of the Sturman ranch in Goshen County, Wyoming. Between April 30 and September 10, 1985, following her husband's death, appellant obtained credit from the bank on six separate occasions. As evidenced by six promissory notes, appellant agreed to repay the principal amount of the loans, $205,900, plus interest by November 30, 1985. The notes also provided that the loans were secured by all of appellant's livestock, feed, machinery, equipment, and crops. As evidence of the bank's secured interest in her property, appellant also signed two security agreements and a financing statement. The security agreements provided in part that:

"[I]f any attempt shall be made to sell the collateral or remove the same from [Goshen] [C]ounty without the written consent of the Secured Party or its assigns, or if at any time Secured Party or its assigns reasonably deem themselves insecure or unsafe, then Secured Party or its assigns, at its option, may declare the obligations immediately due and payable * * *."

On November 7, 1985, the bank filed a complaint for replevin and a motion for prejudgment seizure. In support thereof, the bank filed affidavits alleging that it had a secured interest in approximately 200 head of cattle belonging to appellant, that it believed the cattle were being weighed in preparation for sale to a Kansas buyer, and that pursuant to the security agreements and § 1–34–103, W.S.1977, it was entitled to possession of the cattle. The district court entered an order for delivery of the property, commanding the sheriff of Goshen County to stop the sale and take possession of the cattle. Pursuant to § 1–34–103 et seq., the matter was set for hearing.

At the hearing on November 13 and 15, 1985, the district court found that there was probable cause to believe that appellant was preparing to sell or remove the secured livestock with the intent to hinder or delay the bank in the collection of the amounts owed. The court also found that probable cause existed to believe that the remaining secured property might be sold and that the proceeds from such sale would not be applied to the promissory notes. In an order filed November 25, 1985, the court directed the sheriff to take possession of the secured property remaining in appellant's possession and authorized the bank to proceed in its replevin action. On the same day, the bank filed a request for issuance of a writ of attachment and a motion for an order to show cause why appellant should not be held in contempt of court. In support of its motion to show cause, the bank filed an affidavit alleging that appellant violated the court's order directing her to deliver the secured livestock remaining in her possession by filing a labor and feed lien on the livestock and demanding payment of the lien from the bank in the amount of $475,550. On November 25, 1985, the district court entered an order directing appellant to appear on December 5 to show cause why she should not be held in contempt. In support of its

request for the issuance of a writ of attachment, the bank filed an affidavit alleging that appellant had deposited $42,000 in Rocky Mountain Federal Savings & Loan Association in Torrington, which sum was subject to attachment. The bank also requested that a writ of garnishment issue to Rocky Mountain Federal. Pursuant to §§ 1–15–102 and 1–15–110, W.S.1977, the district court issued an order of attachment against the property and estate of appellant and a writ of garnishment directing the sheriff to serve a garnishee notice and summons on Rocky Mountain Federal.

On November 27, 1985, appellant filed a petition for a temporary restraining order and preliminary injunction in which she requested that the bank be restrained from attaching or garnishing assets outside the scope of the court's prejudgment attachment order. Among the assets claimed to be outside the scope of the order were $10,000 in Veteran's benefits and $2,400 held in trust for the United Church of Christ. In addition, on December 4, 1985, appellant filed a motion to discharge the writs of attachment and garnishment. After a hearing on December 11, 1985, the district court found:

"1. [The bank's] Writs of Attachment and Garnishment filed herein are valid and [appellant's] petition for temporary restraining orders and motions to quash the Writs of Attachment and Garnishment are denied.

"2. The attachment and replevin bonds filed by the [bank] are sufficient pursuant to W.S. § 1–34–107.

"3. [Appellant's] claimed exemption of $10,000.00 for Veteran's benefits is denied on the basis that [she] failed to establish that funds on deposit in the Rocky Mountain Federal Savings & Loan were 'Veteran[']s benefits'.

"4. [Appellant's] claimed exemption of $2,400.00 for certain funds held in trust for the United Church of Christ is denied on the basis that no evidence that a trust was ever established was presented to the Court.

"5. The [labor and feed] lien filed by [appellant] pursuant to Wyo.Stat. § 29–7–102 is invalid."

The question of appellant's remaining liability to the bank was then set for trial. On December 16, 1985, appellant filed her answer and counterclaim in which she denied the allegations set forth in the bank's complaint. In addition, appellant raised two affirmative defenses: (1) failure of consideration in that the bank did not actually lend her money but simply made a credit entry in its books, and (2) fraud in that the bank had made false and misleading statements since 1971 in order to cause her and her husband to enter into loan arrangements detrimental to their interests. Appellant also counterclaimed against the bank for fraud, deceit and misrepresentation, failure of consideration, bad faith in contract, bad faith in tort, intentional interference with a contractual relationship, conversion, and intentional infliction of emotional distress. She later amended her answer to include the additional counterclaim of wrongful replevin and garnishment. In its reply, the bank generally denied appellant's claims and raised the affirmative defense that her counterclaim failed to state a claim and was frivolous as a matter of law. On January 21, 1986, the bank moved the district court to enter summary judgment on its complaint. Appellant filed a resistance to the bank's motion for summary judgment. In support thereof, she filed a memorandum of law, eight affidavits, three depositions, and a number of exhibits. A hearing on the motion was held February 17, 1986, and on March 24, 1986, the court entered summary judgment for the bank. With respect to the bank's complaint and appellant's counterclaim, the district court found as follows:

"1. [Appellant] executed and delivered to the First National Bank, Torrington, Wyoming, ('Bank') six (6) promissory notes dated April 30, 1985, May 15, 1985, June 24, 1985, July 11, 1985, August 7, 1985, and September 10, 1985, in the total amount of $205,900.00 and as of March 18, 1986, after crediting net pro-

ceeds from sale of assets secured to the Bank, there remained due and owing to the Bank on said promissory notes the sum of $65,223.55 in principal and interest, together with attorney fees and costs to January 21, 1986, in the amount of $13,813.34, for a total sum of $79,036.89, which is due and owing to [the Bank] from [appellant].

"2. [Appellant's] affirmative defenses and counterclaims interposed in this action are without merit, present no genuine issue as to any material fact to support [appellant's] contentions and such counterclaims should be dismissed with prejudice."

On the basis of these findings, the court ordered in relevant part:

"A. That [the bank] have and recover judgment against [appellant] in the sum of $79,036.89 as of this date;

"B. That [appellant's] counterclaims be and the same are hereby dismissed with prejudice; and

"C. That the Clerk of Court shall release [the bank's] replevin bond and return all money the [bank] has posted and the [bank] is hereby released from any and all liability resulting from its replevin action."

On appeal from that judgment, appellant raises the following issues:

"I. A CONFLICT OF INTEREST EXISTS BETWEEN THE APPELLEE'S ATTORNEY AND THE APPELLANT.

"II. THE PREJUDGMENT ATTACHMENT AND GARNISHMENT STATUTES WERE UNCONSTITUTIONALLY APPLIED TO JANICE STURMAN IN VIOLATION OF HER CONSTITUTIONAL RIGHTS OF DUE PROCESS AND EQUAL PROTECTION.

"III. APPELLEE WAS GRANTED SUMMARY JUDGMENT PURSUANT TO RULE 56 OF THE WYOMING RULES OF CIVIL PROCEDURE. THAT SAID SUMMARY JUDGMENT SHOULD NOT HAVE BEEN GRANTED BASED ON THE EXISTENCE OF GENUINE ISSUES OF MATERIAL FACT AND APPELLEE WAS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW."

I

The attorney representing the bank in this action against appellant is also a member of the bank's loan committee and board of directors. At the November 13 and 15 hearing, appellant contended, as she does before this Court, that, as a member of the board of directors, counsel's primary duty is to protect the bank's depositors. According to appellant, counsel cannot satisfy his duty to the bank's depositors if he is simultaneously representing the bank in an action against one of its depositors.

There is no question that board members have a duty to protect their depositors. *Morrison v. State Bank of Wheatland*, 58 Wyo. 138, 126 P.2d 793 (1942). However, the diligent collection of debts owed to the bank does not, as appellant claims, conflict with that duty. Foremost among board members' duties to depositors is the maintenance of the bank's solvency which necessarily includes the collection of debts, even from the bank's own depositors. In the present case, the board had ample reason to believe that appellant did not intend to repay the $205,900 extended to her and, in fact, that she was intentionally hindering the bank's efforts to collect the amount owed. Under these circumstances, it would have been a violation of the board members' duty to their depositors not to have acted to collect the debt. For these reasons, we find no conflict of interest between counsel's representation of the bank in this action and his duty to bank depositors as a member of the board of directors.

II

Appellant states the second issue as follows:

"THE PREJUDGMENT ATTACHMENT AND GARNISHMENT STATUTES WERE UNCONSTITUTIONALLY APPLIED TO [HER] IN VIOLATION OF HER CONSTITUTIONAL RIGHTS OF

DUE PROCESS AND EQUAL PROTECTION."

In actuality, however, her argument touches upon a spectrum of claims, some of which relate to the constitutionality of the statutes or the manner in which they were applied in this case, and some of which do not. In the course of her argument, appellant questions whether:

 A. Section 1–15–102 is unconstitutional in that it allows the clerk of court to issue a writ of attachment;

 B. Section 1–15–102 is unconstitutional in that it allows a writ of attachment to issue on the basis of a conclusory affidavit;

 C. Section 1–15–102 was unconstitutionally applied in this case, because the affidavits filed by the bank were conclusory and did not set forth specific facts supporting the claim for relief;

 D. Upon her denial of the grounds for attachment set forth in the bank's affidavit, the burden of proof shifted back to the bank to provide additional evidence supporting its claim for relief, and the bank failed to satisfy that burden;

 E. The attachment was improper, because the bank did not prove the existence of a debt; and

 F. The attachment of additional assets belonging to appellant was improper, because there was no showing that the proceeds from the sale of the cattle were insufficient to satisfy the debt.

■ With respect to the claim that § 1–15–102 is unconstitutional because it allows the clerk of court to issue a writ of attachment, it is well established that:

"A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations." *County Court of Ulster County, New York v. Allen,*

442 U.S. 140, 154–55, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979).

See also *Stagner v. Wyoming State Tax Commission,* Wyo., 682 P.2d 326 (1984). In the present case, the alleged defect in the statute was not applied to appellant. The writ of attachment was issued by the district judge, not the clerk of court. Therefore, appellant does not have standing to contend that the statute is unconstitutional in that it allows the clerk of court to issue a writ of attachment.

Appellant's next two assertions, that § 1–15–102 is unconstitutional or was at least unconstitutionally applied in that the writ of attachment was issued on the basis of conclusory affidavits, are also without merit. This action arose out of the bank's efforts to recover possession of property in which it had a security interest. The relevant statutory sections under which the bank proceeded provide in pertinent part:

Section 1–34–101, W.S.1977.

"The possession of specific personal property may be recovered in an action in district or county court as provided by law subject to jurisdictional limits of county courts."

Section 1–34–102, W.S.1977.

"(a) An order for the delivery of property to the plaintiff shall be issued by the court in which the action is brought following a hearing and when there is filed an affidavit of the plaintiff, his agent or attorney, showing:

 "(i) A description of the property claimed;

 "(ii) That the plaintiff is the owner of the property, or has special interest therein, and if the ownership or interest is special or partial, the fact shall be stated;

 "(iii) That the property is wrongfully detained by the defendant;

 "(iv) That it was not taken upon any process issued against the plaintiff, or if taken under such process that the property was exempt from execution expressly or upon demand or selection by the plaintiff, and is not held for a tax, or if held for a tax that it is not

held for any tax legally assessed or levied against the plaintiff."

Section 1-34-103(a), W.S.1977.

*"If the affidavit alleges any of the grounds for attachment stated in W.S. 1-15-401, the court shall issue an order for delivery of the property described in the affidavit without a hearing.* In other cases a hearing shall be held before the order of delivery is issued." (Emphasis added.)

Section 1-15-401, W.S.1977.

"(a) A creditor may bring an action on his claim *before it is due,* and have an attachment against the property of the debtor:

"(i) When a debtor has sold, conveyed or otherwise disposed of, or is about to sell, convey or otherwise dispose of his property, or is about to remove his property or a material part thereof, with the intent to cheat or defraud his creditors or to hinder or delay them in the collection of their debts; or

"(ii) When a debtor is about to become a nonresident of the state." (Emphasis added.)

Under these provisions, the bank clearly was entitled to seek a writ of attachment before the debt was due and an order for delivery of the property without a hearing. The affidavit filed by the bank in support of its complaint for replevin showed in part:

1. A description of the property claimed by reference to the attached financing statement;

2. That the bank had a perfected security interest (a special interest) in the described property;

3. That the property was not detained wrongfully by the defendant; and

4. That the property was not taken upon any processes issued against the plaintiff.

The affidavit filed by the bank in support of its motion for prejudgment seizure showed in relevant part:

"4. That Plaintiff is entitled to the immediate possession of approximately 200 head of livestock * * * which are owned by the Defendant.

"5. That the approximate value of [said] cattle is $45,000.00.

"6. That the basis of Plaintiff's right of possession of the above-described property is based on a security agreement, a copy of which is attached hereto as Exhibit 'A' and by reference is incorporated herein.

"7. That Affiant has been informed by L.E. Anderson that the Defendant intends to have the above[-]described property removed from Goshen County, Wyoming, [on] or about the 7th day of November, 1985.

"8. That Plaintiff never consented to Defendant's selling said livestock or removing the same from Goshen County, Wyoming.

"9. That the propos[ed] sale of said livestock without the Plaintiff's consent is a violation of the attached security agreement * * * and is made with the sole intent of defrauding the Plaintiff or to hinder or delay it in the collection of its debts."

Thus, the allegations set forth in the affidavits and exhibits are not conclusory as appellant claims. They clearly demonstrate that appellant obtained credit from the bank, that she pledged her livestock as security for that credit, that the bank was told appellant intended to remove the cattle from the county without consent, and that appellant's actions violated the security agreement, entitling the bank to seek prejudgment relief. As appellant herself states, in order to pass constitutional muster, the affidavits filed in support of a prejudgment seizure must set forth specific facts supporting the claim for relief. We find the affidavits in this case to be entirely sufficient in that respect.

Having concluded that the affidavits are not conclusory and that the manner in which the statutes were applied to appellant was constitutional, we also conclude that appellant does not have standing to challenge the constitutionality of the statute on the ground that it allows a writ of

attachment to issue on the basis of a conclusory affidavit.

■ Appellant's next contention is that because she positively denied the grounds for relief set forth in the bank's affidavit, the burden of proof shifted back to the bank to produce additional evidence in support of its claim. Appellant relies on *Collins v. Stanley*, 15 Wyo. 282, 88 P. 620 (1907), and *Smith v. Varel Manufacturing Company*, Wyo., 378 P.2d 680 (1963), wherein this Court stated that an additional burden of proof rests upon the plaintiff when the grounds for attachment are positively denied by the defendant in the affidavit supporting the motion to discharge.

In the present case, appellant filed a motion to discharge the writs of attachment and garnishment on December 4, 1985. In a supporting affidavit, appellant denied that she was

"about to remove her property out of the jurisdiction of this Court with intent to defraud her creditors; that she [was] about to convert her property into money for the purposes of placing it beyond the reach of her creditors; that she [was] about to dispose of her property with the intent to defraud her creditors; that she [had] property which she conceal[ed]."

At the hearing following appellant's denial, the bank produced evidence that: (1) appellant signed the six promissory notes; (2) she agreed to pay the amounts due by November 30, 1985; (3) she signed two security agreements and a financing statement in which she pledged her property as security for the credit she obtained from the bank; (4) the security agreements provided that if the bank reasonably deemed itself insecure, it was entitled to accelerate payment of the debt; (5) the security agreements also provided that appellant must notify the bank before selling or removing any of the property; (6) appellant agreed to sell her 1985 calf crop in November to a buyer from Kansas; (7) appellant did not notify the bank of her plans to sell the calf crop to a Kansas buyer; (8) only $300 of the original $205,900 loan remained in appellant's account; (9) three times in the past appellant had sold property without the bank's consent and did not apply the proceeds to the debt; and (10) appellant filed suit in federal court seeking a recision of the debt. In addition, evidence was presented that, in late November 1985, she transferred the titles to her 1984 Mercury and 1968 motor home to her son, and she transferred accounts to different institutions for no apparent reason. Given this evidence, we find that the bank sufficiently satisfied its burden of proof under the standard enunciated in Collins and Smith.

■ Appellant's next argument is that the issuance of the writ of attachment was improper because the bank failed to prove the existence of a debt. As we already have indicated, appellant testified that she signed six promissory notes which entitled her to obtain credit in the amount of $205,900, plus interest. In addition, she testified that she agreed to repay the amount by November 30, 1985. She testified further that, as of November 13, only $300 of the amount borrowed remained in her account. Despite her own testimony that she spent $205,600 of the amount loaned to her, appellant claims that no debt exists because the bank did not give her money but merely made a credit entry in her account. We are not persuaded. As appellant indicated in her own testimony, the effect of the credit entry was no different than if she had received cash. There simply is no question that the bank proved the existence of a debt.

■ Finally, appellant contends that the attachment of additional assets belonging to her was improper prior to sale of the cattle, because there was no showing that the proceeds from that sale would be insufficient to satisfy her indebtedness. We do not agree. At the time the writs of attachment and garnishment issued, the district court had before it evidence that appellant's cattle were worth approximately $45,000. The court also had before it evidence that appellant owed the bank $219,171.39 plus interest pursuant to the terms of the promissory notes. This evidence,

when combined with all of the evidence indicating that appellant was attempting to avoid repayment of her debt, clearly constitutes sufficient grounds for the issuance of a writ of attachment as provided in §§ 1–15–101(a)(vi), (vii), and (viii) and 1–15–102(a)(iii), W.S.1977.

## III

The final question we must decide is whether the district court properly granted summary judgment in favor of the bank. As appellant contends, summary judgment is proper only if, upon reviewing the pleadings, depositions, affidavits, and other material properly contained in the record, the court finds that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(c), W.R.C.P. When reviewing a summary judgment,

> "[w]e look at the record from the vantage point most favorable to the party opposing the motion, giving him every favorable inference which may be drawn from * * * the * * * material [contained] in the record." *Wyoming Recreation Commission v. Hagar*, Wyo., 711 P.2d 402, 404 (1985).

> "[The] party moving for a summary judgment has the burden of showing there is no genuine issue of material fact. A material fact is one which, if proved, would have the effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties." *Id*. (citation omitted.)

Viewing the record before us in the light most favorable to appellant, we are unable to find a genuine issue of material fact which makes summary judgment improper. The material facts, those which would refute or establish an essential element of the cause of action, are not in dispute. Both parties agree that appellant obtained credit from the bank, signed six promissory notes the terms of which required her to repay the loan by November 30, 1985, pledged her property as security for the loan, and signed security agreements which provided that she could not sell or remove the collateral without the written consent of the bank. In addition, there is no dispute that appellant thereafter attempted to sell a portion of the secured property to a Kansas buyer without notifying the bank and attempted to avoid repayment of the loan in a variety of ways, including seeking recision of the debt in federal court.

■ Despite the absence of dispute on these material facts, appellant contends that numerous other issues of material, disputed fact exist which make summary judgment improper. She contends that "[e]ach and every allegation in the Complaint for Replevin and prejudgment attachment was conclusory in nature," and "[n]one of them were supported by specific facts." To illustrate, the bank alleged in its complaint that it loaned appellant $205,900. Appellant contends that the bank did not loan her $205,900, and therefore an issue of fact exists as to this allegation. We have already said that we are not persuaded by appellant's claim that no debt exists because the bank merely credited her account instead of actually giving her "money" or "dollars." Whatever appellant may choose to call it, she was able to pay for her needs by writing checks on her account to the tune of $205,600, which she would not have been able to do but for the bank's "credit entry." Appellant admits that the bank extended credit to her account, that she wrote checks on that account, and that only $300 of the amount extended remains in her account. Therefore, there is no genuine issue of material fact as to the existence of the loan. Our conclusion on that issue also helps to resolve appellant's claim that a genuine issue of material fact exists as to whether the security agreements are supported by valuable consideration. It is well established that the performance of an act by one not legally obligated to perform is sufficient consideration since it is a legal detriment although it may not be an actual detriment. 17 Am.Jur.2d, Contracts § 97 (1964). Thus, we have said that the making of a loan constitutes valuable consideration.

*Laibly v. Halseth,* Wyo., 345 P.2d 796 (1959). In the present case, the bank advanced $205,900 to appellant, and she fully expended for her benefit all, but $300 of that amount. On the basis of that transaction, we have already concluded that a loan existed. Thus, there was valuable consideration, and the security agreements are valid.

Appellant also alleges that a genuine issue of material fact exists with respect to the meaning of the security agreements. Summary judgment is proper where the language of an agreement is plain and unambiguous. *Sannerud v. First National Bank of Sheridan,* Wyo., 708 P.2d 1236 (1985). In the present case, the language of the instruments signed by appellant is plain and unambiguous. The instruments clearly required appellant to obtain written consent from the bank before attempting to sell the secured property or remove it from the county, and they clearly entitled the bank to declare the loan immediately due if it deemed itself insecure. Appellant's contention that she did not read the instruments before signing them and that the bank failed to point out the important provisions is without merit. A person signing a contract cannot avoid it on the ground that he did not read it. *Laird v. Laird,* Wyo., 597 P.2d 463 (1979).

Appellant next contends that a question of fact exists as to whether she attempted to sell or remove the secured property from Goshen County. Appellant's own testimony clearly shows that she entered into an agreement with a Kansas buyer to sell her 1985 calf crop on or about November 7 and was in the process of delivering the calves to the feed lot when the sheriff stopped the sale.

 Contrary to her last claim, appellant then admits that she attempted to sell the cattle to a Kansas buyer but contends that she did not violate the security agreements by doing so because she and her husband always sold their cattle at this time of year without the bank's consent, and the bank never objected. Appellant's argument fails to take into account that

portion of the security agreements which allows the bank to accelerate payment of the debt if at any time it reasonably deems itself insecure. Within the limits of that provision and § 34–21–127, W.S.1977, the bank was entitled to declare the loan due regardless of the parties' prior course of conduct. Section 34–21–127 provides that the power to accelerate payment of a debt must be exercised in good faith. Good faith is defined as honesty in fact in the conduct or transaction concerned. Section 34–21–120(a)(xix), W.S.1977. In the present case, the bank deemed it inadvisable to continue financing appellant's operations in 1986. After informing appellant of that decision, the bank learned that appellant was filing an action in federal court to have the debt rescinded. In addition, upon reviewing appellant's file, the bank discovered that she had fewer cattle in August than she had in April, indicating that she sold some without informing the bank or applying the proceeds to her indebtedness. The bank also discovered that appellant made three deposits from cattle sales in 1985 and yet made no payments on the loan. On the basis of these events and the discovery that appellant was about to sell her entire calf herd in November without consent, the bank accelerated the due date of the debt and brought the replevin action. Under these circumstances, we have no hesitation in finding that the bank in good faith deemed itself insecure and properly declared the obligation due.

 On August 7, 1985, appellant submitted a tentative plan to the bank in which she indicated that she was considering reducing the size of her operation by selling some of her cattle and equipment and leasing part of her land. Then, on August 28, 1985, she submitted a second proposal which described an even greater reduction in her operation. On September 5, 1985, appellant received a letter from the bank which said:

> "At our recent Board of Director's meeting, we discussed your loan with us to some length, and I thought that I should inform you that it is not our intent to

finance your 1986 ranching operation, but that we will be looking forward to your repaying us in full.

"At this time, your debt to us including interest, is $209,631.38, and of course, additional funds will be needed from now *until livestock is sold*, likewise, there will also be additional interest.

"We regret finding it necessary to give you this notice, but I do feel that it should be beneficial to you in your timing and *marketing*." (Emphasis added.)

Appellant now claims that these written exchanges create a question of fact as to whether she sought and received the bank's consent to sell the cattle to a Kansas buyer. Again, appellant's own testimony demonstrates that she did not tell the bank that she intended to sell the cattle to a Kansas buyer.

"Q Why did you not notify the bank that you were going to sell these to a Kansas buyer?

"A We had never notified the bank on the exact day that we are going to sell our calves in the fall."

Thus, there is no genuine issue of material fact as to whether she had the bank's consent to sell the cattle.

Appellant also claims that a disputed issue of fact exists because, under the terms of the promissory notes, payment was not due until November 30, 1985, and the bank seized the cattle on November 7, 1985. The security agreements clearly provide for acceleration of the debt if any attempt is made to sell the collateral or remove it from the county or if at any time the secured party reasonably deems itself insecure. As we have already indicated, the bank was entitled to accelerate the debt on either of those grounds. The terms of the promissory notes are clear and unambiguous as to acceleration of the debt; therefore, there is no genuine issue of material fact concerning the bank's early seizure of the property.

In the final portion of her brief, appellant claims that her affirmative defenses and counterclaim contain numerous issues of material fact prohibiting summary judgment.

Appellant's first affirmative defense is that the security agreements are invalid for lack of consideration because the sum the bank credited to her account was merely a credit entry or paper transfer and not really money or dollars. We addressed this issue earlier in the opinion and will not do so again here.

■ Appellant's second affirmative defense is that the bank knowingly and with reckless disregard for the truth made false and misleading statements and promises of material fact which induced her to enter into loan agreements detrimental to her interests. In support of her claim, appellant alleges generally that the bank promised that it would act in her best interest and assist, advise, and cooperate in the management of her financial affairs and that by refusing to finance her 1986 operations and calling her debt due early, the bank somehow defrauded, deceived, or misled her. There is absolutely nothing in the record to support this claim. Instead, the record reflects that, until the fall of 1985, the bank cooperated fully with appellant in the management of her financial affairs. Despite a "[n]ot always satisfactory" relationship, the bank financed the ranching operations of appellant and her husband for approximately 14 years. After appellant's husband died, the bank extended the credit necessary to keep the ranch going until appellant indicated her intent to wind up or reduce the size of her operations and find other employment. Only when it became evident that appellant was attempting to avoid repayment of her debt did the bank accelerate payment of the loan. Under these circumstances, we find no intent to defraud. Appellant's claim that the bank somehow induced her to enter into loan agreements detrimental to her interest is likewise without merit. Appellant's own testimony clearly demonstrates that she and/or her husband went to the bank to obtain financing; the bank did not come to them. She testified further that although the bank agreed to finance her operations

for 1985, there was no such agreement for 1986. Thus, her claim that the bank deceived her into believing she had a continuing line of credit also lacks merit. We also find nothing to support appellant's claim that, by not disclosing essential terms of the security agreements, the bank somehow lied to her. We have already said that the agreements are clear and unambiguous; appellant's failure to read them will not support a finding that the bank lied to her.

Finally, we are not persuaded by appellant's claim that the bank fraudulently altered the loan documents after she signed them. We have said that:

"A material alteration of an instrument made after its execution by a party offering it into evidence, which alteration was not consented to by the other party, nullifies the instrument as a legal obligation. An alteration is material if it:

"'* * * destroys the identity of the instrument or of the contract evidenced thereby, or which so changes its terms as to give it a different legal effect from that which it originally had, and thus works some change in the rights, obligations, interest, or relations of the parties. * * *' 4 Am. Jur.2d Alteration of Instruments § 5, pp. 6–7 (1962)." *Starrett v. Shepard,* Wyo., 606 P.2d 1247, 1252–53 (1980) (citations omitted).

■ In the present case, although the evidence does disclose that notations were made on some of the documents, none of the notations enlarged or diminished the rights or obligations of the parties. The security instruments, for example, covered all of appellant's machinery. Therefore, the notation adding two items of machinery to the list of secured property did not enlarge appellant's obligation under the agreements and does not constitute a material alteration nullifying the agreements.

■ Throughout her testimony, appellant was asked repeatedly to give specific examples of the bank's efforts to defraud, deceive, and mislead her. Her answers were generally vague and nonresponsive. She stated that she couldn't "remember right off-hand" what facts the bank concealed from her; she would have to "go through [her] records" to know what information the bank failed to disclose; she "would have to think about [it] for a while" to know what statements made by the bank misled her; but she was "sure there [were]" untrue statements made by the bank. Given this testimony and the other evidence contained in the record, we are unable to find a genuine issue of material fact making summary judgment improper on appellant's affirmative defense of fraud, misrepresentation, and deceit.

■ Turning next to appellant's counterclaim, we find that the first two counts are identical to the affirmative defenses discussed immediately above; therefore, there is no need to address them again here. In support of her claims of bad faith in contract and bad faith in tort, appellant points to the fact that:

"[The bank] never pointed out to her that she should read the back or that there was anything on the back of the security agreement. She was never allowed any time in which to look it over and it was never expressed how important it was.

"33. That [the bank] purposely and willfully disregarded her rights under the contract and frustrated the purpose of the operating loan by manipulating the contract provisions, of which she had no knowledge, to [its] benefit and to her detriment.

"34. That she trusted [the bank] to protect her financial health; she trusted [its] advice concerning the operating loan because she had known her husband was dealing with [it] for many years. She specifically trusted [it] to help her after her husband's death to try to run the ranch.

"35. That she never felt like she had any bargaining power or any say in any matter; she merely signed whatever [the bank] required her to sign because she felt [the bank] knew more about it."

These allegations are merely a restatement of those previously considered and dismissed by this Court as unsupported by the record. There is absolutely no evidence which suggests that the bank manipulated the contract provisions to its benefit and to appellant's detriment. That appellant may have trusted the bank and may have been in a weaker bargaining position is not enough to create a genuine issue of material fact with respect to her claims of bad faith in contract and bad faith in tort.

▪ Appellant next contends that her claim that the bank intentionally interfered with her contractual relationship with the Kansas buyer raises a genuine issue of material fact. Again, we find no such issue. The sale was stopped by the sheriff pursuant to a court order and in accordance with the terms of the security agreements and the Wyoming prejudgment attachment statutes. There being no dispute as to these facts, summary judgment was proper as to appellant's claim of interference with a contractual relationship.

▪ In the fifth count of her counterclaim, appellant alleges that the bank is guilty of conversion as a result of the replevin action because the bank was not entitled to possession of the cattle. We have reiterated throughout this opinion that the security agreements clearly entitled the bank to seize the secured property if it deemed itself insecure or appellant attempted to sell or remove the cattle from the county. Pursuant to those agreements, the bank sought and obtained prejudgment judicial relief in accordance with the controlling statutes. Thus, there is no genuine issue of material fact as to appellant's claim of conversion.

Appellant also contends that an issue of fact exists as to her claim of intentional infliction of emotional distress. In order to demonstrate the intentional infliction of emotional distress, appellant must prove that the bank " 'by extreme and outrageous conduct intentionally or recklessly cause[d her] severe emotional distress.' " *Leithead v. American Colloid Company,* Wyo., 721 P.2d 1059, 1065 (1986), quoting

§ 46 of the Restatement, Second, Torts (1965). Outrageous conduct is defined as conduct which goes beyond all possible grounds of decency, is regarded as atrocious, and is utterly intolerable in a civilized community. Id. It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. Id.

▪ In the present case, appellant's affidavit states that she was "in total shock, grief-stricken, and totally lost" following her husband's death; that "she had a deep feeling of emptiness and * * * felt hurt and scared and was in pain"; that "[s]he could not function normally for months * * * and was very lonely"; and that the bank "inflicted intentional emotional distress upon her by forcing her to negotiate loans, just after her husband's death, without explaining to her the repercussions, conditions or requirements." We already have said that there is no evidence to support appellant's contention that the bank "forc[ed] her" to negotiate loans. Given the circumstances, we do not find the bank's efforts to collect the amount due, pursuant to the instruments signed by appellant and in accordance with Wyoming statutes, to be extreme or outrageous. That appellant was suffering from emotional distress due to her husband's death and her uncertain financial situation is not sufficient to present a jury question as to intentional infliction of emotional distress. Therefore, summary judgment was proper.

▪ As indicated previously, after the district court issued the order for delivery of property, appellant filed a feed and labor lien on the cattle and demanded that the bank pay her for feed and storage. The district court held the lien invalid, and appellant now contends that a jury should have decided the matter rather than the court. Appellant provides absolutely no cogent argument or authority for the proposition that the lien was valid; therefore, we would ordinarily decline to address the issue. However, because appellant's actions are clearly prohibited by the terms of

the security agreements, we affirm the district court's finding that appellant's lien is invalid.

The security agreements expressly state: "Debtor convenants and agrees: that, *except for the security interest hereby granted,* the collateral described herein is free and clear of *all liens,* security interests, and other encumbrances * * *." (Emphasis added.)

Even assuming that appellant could create a valid lien on her own property, the language of the security agreements clearly prohibits her from doing so in the present case. To hold otherwise would be to render the terms of the security agreements and the bank's security interest meaningless.

Appellant also takes issue with the manner in which the sale of the cattle was ultimately conducted. The affidavits in support of her claim allege that the cattle were sold at a "bad time" and that the condition of the cattle had deteriorated between the time they were seized and the sale. Section 34–21–966, W.S.1977, requires that the sale of collateral must be commercially reasonable as to method, manner, time, place, and terms. Section 34–21–966(b), W.S.1977, provides in part: "The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner."

In the present case, the security agreements provided: "Where the collateral is livestock, it is agreed that a commercially reasonable means of disposing of the collateral shall include sale of such collateral in *the customary manner* on the Denver, Colorado or Omaha, Nebraska livestock markets *or through a licensed livestock sales ring in Wyoming* * * *." (Emphasis added.)

■ There is no dispute that the sale was made through Torrington Livestock Commission Company, Inc., a licensed livestock sales ring in Wyoming. There is also no dispute that the sale occurred one week after the sheriff took possession of the cattle. Applying the language of § 34–21–966 quoted above, appellant's claim that the cattle should not have been sold between Thanksgiving and New Year's Day is not sufficient to establish that the sale was commercially unreasonable. The bank complied with the statutory requirements and the terms of the security agreements. The agreements signed by appellant did not require the cattle to be marketed as a reputation herd nor did they require them to be sorted by age. Appellant makes no showing that such procedures are "customary" within the meaning of the agreements. Therefore, nothing in the record supports her contention that the sale was commercially unreasonable, and we find summary judgment proper.

■ In addition, as the trial court stated in its decision letter: "[T]he defendant had the opportunity, at the time of the proposed sale of the calves to [the Kansas buyer], to [consummate] said sale simply by agreeing to pay the plaintiff. For reasons unknown to the Court but not at issue here, this was not done. Defendant had the opportunity to post a redelivery bond after the replevin act and recover all of her property. Once again this was not done. Having failed to do any of these things defendant will not be heard to say that she could have obtained a better price or done a better job of caring for the property during the period between levy and sale so as to raise an issue of fact against the plain statement and purpose of Sec. 34–21–966(b) * * *."

Appellant's final claim before this Court is that the bank wrongfully replevined her property and that she has been damaged. This claim was adequately addressed earlier in this opinion; therefore, we decline to address it here.

To summarize our response to the array of issues presented by appellant in support of her claim that summary judgment

should not have been granted, we refer to what was said in *Spurlock v. Ely*, Wyo., 707 P.2d 188, 191 (1985):

"[E]ven though we must consider the record in the light most favorable to the party opposing the motion for summary judgment and give him all favorable inferences to be drawn from the facts, *any inferences drawn must be based on facts in the record. '[A]n inference which is contrary to direct testimony is insufficient to support a finding that a genuine issue of material fact exists,'* [*Blackmore v. Davis Oil Company*, Wyo.,] 671 P.2d [334,] 337 [1983]." (Emphasis added.)

In the present case, the vast majority of appellant's "facts" are, quite simply, contrary to the direct testimony and other evidence contained in the record and are, therefore, insufficient to raise a genuine issue of material fact. For that reason, we find that the district court's order granting summary judgment in favor of the bank on its complaint and against appellant on her counterclaim was entirely proper.

Throughout the course of these proceedings, appellant has referred many times to the importance of this case, not only to her personally but also to the entire farming community in the United States. The theme of her claims is "[t]hat the family farming sector of the nation * * * is being targeted for extinction by the private money monopolists." We are sensitive to the plight of the American family farm. We are fully aware that nationwide individuals like appellant are losing their land, their homes, and their way of life. However, no matter how much appellant would like to convince us otherwise, we find that the bank acted properly throughout its dealings with appellant. In addition, appellant was afforded every opportunity to present her case. Four hearings were held, the witnesses called by the parties testified and were cross-examined extensively, numerous affidavits, depositions, and exhibits were introduced, and counsel for both parties submitted extensive legal briefs and memoranda in support of their claims. Under these circumstances, we find no denial of due process.

Affirmed.